Hon. Ricardo S. Martinez

Presented to the Court by the foreman of the Grand Jury in open Court, in the presence of the Grand Jury and FILED in The U.S. DISTRICT COURT at Seattle, Washington.

JUNE 4 20.09

BRUCE RIFKIN, Clerk

By_____ Deputy

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY I. GREENSTEIN,<br>CHARLES H. WILK, and<br>MATTHEW G. KRANE,<br><br>Defendants. | NO. CR08-0296RSM<br><br>SUPERSEDING INDICTMENT<br><br><br>08-CR-00296-INDI |

THE GRAND JURY CHARGES THAT:

## COUNT 1
### (Conspiracy to Defraud IRS)

1.      Beginning at a time unknown, but no later than in or about June 1999, and continuing until in or about August 2006, at Seattle, Washington, within the Western District of Washington and elsewhere, JEFFREY I. GREENSTEIN and CHARLES H. WILK, and others known and unknown, did knowingly conspire, combine, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service (hereinafter, "IRS") of the United States Department of Treasury, for the purpose of impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of incomes taxes, interest, and penalties.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# I.  INTRODUCTION

**A.     Defendants and Other Relevant Parties.**

At all times relevant to this Superseding Indictment:

2.     Quellos Group, L.L.C. (hereinafter "Quellos"), formerly known as Quadra Capital Management, L.P., was an investment management services firm founded in or about 1994 and headquartered in Seattle, Washington.

3.     Defendant JEFFREY I. GREENSTEIN was a founder and Chief Executive Officer of Quellos.  JEFFREY I. GREENSTEIN has a bachelors degree in finance and extensive experience dealing in complex securities and derivative markets.  Prior to founding Quellos, JEFFREY I. GREENSTEIN was a General Partner of another registered investment advisory firm that provided alternative investment strategies through the use of derivatives and hedging transactions.  Previous to that, JEFFREY I. GREENSTEIN had been affiliated with a national investment advisory firm, marketing derivative securities to institutional clients.

4.     Beginning in or about 1996, JEFFREY I. GREENSTEIN gained knowledge and experience in tax shelters through work with certain national accounting firms on tax shelter strategies to include, among others, FLIP (Foreign Leveraged Investment Program), OPIS (Offshore Portfolio Investment Strategy), and CDS (Contingent Deferred Swaps).  JEFFREY I. GREENSTEIN, with others at Quellos, assisted national accounting firms by designing aspects of FLIP and OPIS, and provided execution services in connection with approximately 150 individual FLIP and OPIS transactions.  JEFFREY I. GREENSTEIN, with others at Quellos, also promoted and provided execution services for a number of CDS transactions.  Through JEFFREY I. GREENSTEIN's work on the various tax shelters, Quellos earned tens of millions of dollars in fees.  Through JEFFREY I. GREENSTEIN's involvement in FLIP and OPIS alone, Quellos earned between $25 million and $50 million in fees.  In addition, JEFFREY I. GREENSTEIN gained further knowledge about tax shelters by personally participating in a FLIP shelter for himself.

Greenstein et al Indictment 2

5.      Quellos Customs Strategies, LLC (hereinafter "QCS"), was formed in or about March 1999 as a wholly owned subsidiary of Quellos. QCS was formed with the goal of providing customized services to high net-worth individuals and families, including designing and implementing customized tax shelter strategies to minimize or defer payment of taxes. Through QCS, JEFFREY I. GREENSTEIN sought to capture a part of the lucrative tax shelter market from the national accounting firms for themselves. JEFFREY I. GREENSTEIN also sought to use these tax shelter strategies as a means to attract wealthy clients to the firm who could then be persuaded to invest their assets with Quellos, thereby expanding Quellos's investment business. One such tax shelter strategy developed and implemented by QCS was a strategy that came to be known as "POINT" (Portfolio Optimized INvestment Transaction).

6.      Defendant CHARLES H. WILK, a lawyer with a Masters Degree in tax law, joined Quellos in or about June 1999 as a principal. As part of his duties, CHARLES H. WILK directed QCS's tax shelter business. Prior to joining Quellos, CHARLES H. WILK was a senior manager with a national accounting firm, whose duties included providing tax shelter strategies for the accounting firm's wealthy clients. Previous to his position at the accounting firm, CHARLES H. WILK was an associate in the tax department of a national law firm.

7.      European American Investment Holdings NV was incorporated in or about June 1999 in the Netherlands Antilles. European American Investment Holdings NV was a holding company under which a group of companies known as European American Investment Group (hereinafter "Euram") was organized. Euram was formed by American and European investors, in part, to acquire an Austrian bank, which came to be known as European American Investment Bank AG.

8.      In or about 1999, principals from Quellos, including JEFFREY I. GREENSTEIN, became shareholders in Euram and stood to profit from Euram's business.

9.      Of the other Euram companies, two United Kingdom-based subsidiaries,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

European American Corporate Services Limited and European American Advisors Limited, focused on advising and providing structured financial products for high net worth individuals. The key members of the management of Euram included:

    a.    C.D., Euram's Chief Executive Officer;

    b.    J.S., Euram's Head of Tax and Structured Products; and

    c.    R.P., Euram's Head of Risk Management and Alternative Investments.

10.    Beginning in or about late 1999 and continuing through in or about 2002, C.D., J.S., and R.P. of Euram assisted Quellos by providing execution services, such as drafting transactional documents and finding and appropriating offshore shell companies, in furtherance of tax shelter strategies developed by QCS. Euram earned large fees for its participation in the tax shelter transactions developed and marketed by QCS, generally 1% of the tax loss desired by the taxpayer client.

11.    Beginning in or about 1999 and continuing through in or about 2000, Partner L.S. of Law Firm C.S. & M. LLP provided legal advice to JEFFREY I. GREENSTEIN and CHARLES H. WILK with respect to the development and implementation of POINT, and issued legal opinion letters to at least four clients who entered into POINT tax shelter transactions.

12.    In 2001 and 2002, Law Firm B.C. LLP provided legal opinion letters to at least two clients who entered into POINT tax shelter transactions.

**B.    The POINT Tax Shelter.**

13.    Beginning in or about 1999 and continuing through in or about 2001, JEFFREY I. GREENSTEIN and CHARLES H. WILK designed, marketed and implemented the tax shelter strategy known as POINT. In or about 2000 and 2001, six POINT tax shelters were executed on behalf of five wealthy individuals:

    a.    In 2000, Client M.Z. executed a POINT tax shelter transaction with Quellos. Client M.Z.'s POINT tax shelter transaction was known as "Torens."

    b.    In 2000, Client R.J. executed a POINT tax shelter transaction with

Greenstein et al Indictment 4

Quellos. Client R.J.'s POINT tax shelter transaction was known as "Reka."

c.    In 2000, Client B.J. executed a POINT tax shelter transaction with Quellos. Client B.J.'s POINT tax shelter transaction was known as "Burgundy."

d.    In 2000 and then in 2001, Client M.S. executed two POINT tax shelter transactions with Quellos. Client M.S.'s POINT tax shelter transactions were known respectively as "Platinum" and "Cobalt."

e.    In 2001, Client H.S. executed a POINT tax shelter transaction with Quellos. Client H.S.'s POINT tax shelter transaction was known as "Titanium."

14.    The total amount of fees paid by the clients to participate in POINT was approximately $86 million. The clients who participated in the POINT tax shelter collectively sought to shelter approximately $2 billion in capital gains and avoid payment of more than $400 million in federal taxes.

15.    The objective of POINT was to offset capital gains and defer and reduce taxes on those gains. In furtherance of this tax saving objective, JEFFREY I. GREENSTEIN and CHARLES H. WILK, with the assistance of C.D., J.S., and R.P. of Euram, designed a series of transactions and executed those transactions on behalf of their clients in order to obtain the desired tax benefits. While each of the six POINT transactions varied somewhat in actual implementation, they typically included the following steps:

a.    During late 1999 and continuing through 2000, an "offshore investment fund" purportedly purchased shares of stock in well known, publicly-traded technology companies. The fund then formed a number of offshore partnership entities and contributed portions of its portfolio of stock to such partnerships. These partnership entities were known generically as "Special Purpose Vehicles" or "SPVs."

b.    The fund then purportedly caused each SPV to issue "Covered Warrants" against their respective baskets of stocks. The Covered Warrants operated like a long-dated call, meaning that an outside investor could purchase the Warrant for a premium in return for the right in five years to purchase the stocks in the SPV at a set

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

price. In this case, each Covered Warrant was purportedly placed with a "bank" or some other financial institution that purportedly paid millions in premiums to the SPVs for the Warrants. The institution then was purportedly responsible for further marketing the Warrant to others.

c.    Once the Warrants were issued, a U.S. taxpayer acquired from the offshore fund the partnership interests in an SPV. At the time the client acquired his or her partnership, the technology stocks that the fund had purportedly contributed to the partnership had fallen in value and, therefore, the partnership had built-in, unrealized losses.

d.    After the client acquired the partnership, he or she contributed to the partnership his or her own assets. These assets, typically other stock that the client desired to sell, had unrealized gains.

e.    Shortly after the client contributed his or her own assets, within a matter of two or three months, all or most of the assets within the partnership were sold, including the purported shares of technology stock with the built-in loss. The sale of the pre-existing portfolio also purportedly triggered a cancellation of the "Covered Warrant" under terms that ultimately resulted in no economic impact on the partnership or the client who acquired the partnership. The client then offset the gains from his or her contributed assets with the alleged losses stemming from the pre-existing portfolio.

f.    Subsequently, the client was able to draw out of the partnership, tax free, the proceeds up to the client's basis in the partnership, or continue to maintain the proceeds within the partnership tax free, and invest it further.

C.    **IRS Treatment of Tax Shelters.**

16.    During all times relevant to this Superseding Indictment, JEFFREY I. GREENSTEIN and CHARLES H. WILK knew and understood that tax shelters that the IRS concluded were designed, marketed and implemented solely for the purpose of providing clients with a way to defer or reduce tax, would be challenged by the IRS. In that event, the IRS would seek to collect the unpaid taxes plus interest, and might also

Greenstein et al Indictment 6

seek to impose substantial penalties upon the clients.

17.    During all times relevant to this Superseding Indictment, JEFFREY I. GREENSTEIN and CHARLES H. WILK knew and understood that in order for a tax shelter strategy to survive challenge by the IRS, taxpayers were generally required to demonstrate the following:

a.    First, the individual transactions that comprised the shelter possessed real economic substance and were not sham transactions;

b.    Second, the transactions that comprised the shelter were not pre-arranged and orchestrated solely for the purpose of obtaining a tax benefit; and

c.    Third, the various parties involved in the transactions had a bona fide business purpose for engaging in the transactions, i.e., that the client and others had a reasonable profit motive to take part in the transaction other than for tax savings.

18.    During all times relevant to this Superseding Indictment, JEFFREY I. GREENSTEIN and CHARLES H. WILK also knew and understood in the event that the IRS disallowed a benefit obtained as a result of a tax shelter, the IRS could impose substantial penalties ranging from 20% to 40% of the underpayment attributable to the shelter, unless the claimed tax benefit was supported by an independent legal opinion, reasonably relied upon by the taxpayer in good faith.  Therefore, JEFFREY I. GREENSTEIN and CHARLES H. WILK knew and understood that in order to induce clients to participate in a shelter, and to shield the clients from possible penalties, they had to obtain legal opinion letters from reputable law firms concluding that a shelter will at least "more likely than not" survive IRS challenge.

## II.  OBJECT OF THE CONSPIRACY

19.    It was a part of and an object of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK, together with others known and unknown, to unlawfully and knowingly defraud and attempt to defraud the IRS by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes, interest, and

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

penalties by designing, marketing, implementing, and defending and aiding in the defense before the IRS of a fraudulent tax shelter known as POINT.

### III.  MANNER AND MEANS OF THE CONSPIRACY

20.    It was a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK designed and developed the POINT tax shelter to consist of a pre-ordained series of sham transactions, executed in precise steps in accordance with the directions of JEFFREY I. GREENSTEIN and CHARLES H. WILK, for the sole purpose of providing a means for wealthy individuals to reduce and/or defer the payment of taxes on capital gains income.

21.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK implemented the POINT tax shelter in a manner that minimized costs to Quellos and maximized their profits.  Specifically, JEFFREY I. GREENSTEIN and CHARLES H. WILK knew and understood that the procurement of sufficient amounts of actual stocks to generate the losses for the POINT clients would cost more than they or others involved in the implementation of the shelter were able or willing to pay.  Furthermore, JEFFREY I. GREENSTEIN and CHARLES H. WILK were unsuccessful in locating any bona fide, independent third-party who had real assets with sufficient built-in losses willing to participate in the POINT transaction.  Therefore, JEFFREY I. GREENSTEIN and CHARLES H. WILK caused the creation of a fictional "offshore investment fund" with a fictional portfolio of stocks that had been obtained through a series of sham paper transactions in which no stocks and no money ever exchanged hands.

22.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK knew at the time they designed, marketed and implemented the POINT tax shelters that the various clients who participated in the shelter would likely be audited by the IRS.  Therefore, JEFFREY I. GREENSTEIN and CHARLES H. WILK drafted and disseminated, and caused to be drafted and disseminated, marketing material, transactional documents, and legal opinions designed to conceal from the IRS the facts

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that first, each aspect of the POINT tax shelter, including the actions of the "offshore investment fund" was wholly conceived, orchestrated, and directed by JEFFREY I. GREENSTEIN and CHARLES H. WILK for the purpose of implementing a tax shelter, and second, that the purported stocks that generated the off-setting losses for POINT clients were, in truth and fact, non-existent.

A.   **Fraudulent POINT Marketing Materials**.

23.   It was further a part of the conspiracy that in order to conceal and attempt to conceal from the IRS the true nature of the POINT tax shelter, JEFFREY I. GREENSTEIN and CHARLES H. WILK drafted and disseminated and caused to be drafted and disseminated to POINT clients and their advisors, false, fraudulent and misleading descriptions of the POINT transaction in a marketing document entitled "POINT Strategy," knowing and expecting that such clients and their advisors would rely upon the document to claim false and fraudulent tax benefits as well as in defense of any audit before the IRS. The POINT Strategy document purportedly set forth the genesis and business rationale for the POINT transaction. According to the document, the POINT Strategy was an investment opportunity independently fashioned by offshore parties to replicate a popular European investment vehicle, and only fortuitously discovered by Quellos. The document described this supposed investment opportunity as follows:

a.   A certain unnamed "offshore investment fund" desired to profit from replicating a European financial product sold by large European financial institutions known as "Covered Warrants," "BLOCS," or "HYPOS."

b.   In order to replicate this product, the fund formed a partnership entity known generically as an SPV ("Special Purpose Vehicle"). Once the SPV was formed, the fund contributed certain publicly traded "stocks" it purportedly owned to the SPV. The fund then caused the SPV to issue a "Covered Warrant" on the stocks in the SPV. The terms of the Covered Warrant gave the acquirer of the Warrant the right to purchase the SPV's stocks in five years at a set price in return for a large premium.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

According to the POINT Strategy document, a "bank" agreed to subscribe to the Covered Warrant and paid millions in premiums to the SPV with the intention of marketing the Warrant to other investors.

c.  Once the SPV was formed, funded and the Covered Warrant placed with the bank, the fund, with the assistance of the bank, sought to sell the entirety of the SPV interests to potential investors with the goal of profiting from the sale.  According to the POINT Strategy document, Quellos only became involved in marketing this opportunity because the bank, which had a pre-existing relationship with Quellos, approached Quellos to assist them in marketing the SPV units to U.S. investors.

24.  It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK knew, in truth and fact, that contrary to what was stated in the POINT Strategy document, the "offshore investment fund" was not an independent investment fund who formed and marketed the SPV interests with the desire to replicate a popular European investment vehicle, but rather, a shell corporation whose actions were wholly controlled by JEFFREY I. GREENSTEIN, CHARLES H. WILK and their Euram associates for the sole purpose of implementing a tax shelter.

25.  It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK knew, in truth and fact, that contrary to what was stated in the POINT Strategy document, the "offshore investment fund" owned no stocks to contribute to the SPVs.

26.  It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK knew, in truth and fact, that contrary to what was stated in the POINT Strategy document, the "Covered Warrant" was a sham paper transaction, that no "bank" subscribed to any Warrant, that no premiums were ever paid for the Warrant by any such bank, and that there was never any intent by any bank to market the Warrant.

27.  It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK knew, in truth and fact, that contrary to what was stated in the POINT Strategy document, Quellos was not fortuitously introduced by the bank to the

Greenstein et al Indictment 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

POINT Strategy and asked to assist in marketing the product to U.S. investors but, rather, JEFFREY I. GREENSTEIN and CHARLES H. WILK conceived, designed and orchestrated the entire POINT strategy, including the actions of the purported "offshore investment fund," and intended from the beginning to market the strategy to U.S. taxpayers as a tax shelter.

**B.    Fraudulent POINT Transaction Documents.**

28.    It was further a part of the conspiracy that in order to conceal and attempt to conceal the true nature of the POINT tax shelter from the IRS, JEFFREY I. GREENSTEIN and CHARLES H. WILK drafted and executed and caused to be drafted and executed false, fraudulent and misleading contracts and agreements to document the various steps in the POINT transaction, knowing and expecting that clients who participated in POINT would rely upon such documents to claim a false and fraudulent tax benefit as well as in defense of any audit by the IRS.

29.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK represented and caused to be represented to clients and others that an Isle of Man entity known as Barnville Ltd. (hereinafter "Barnville") was the "offshore investment fund" that created the SPVs and contributed the loss generating stocks.

30.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK caused to be drafted and executed a series of false, fraudulent, and misleading "Purchase Agreements" dated December 28, 1999, January 3, 2000, January 10, 2000, February 28, 2000, and June 6, 2000, through which Barnville purportedly purchased more than $9 billion worth of stocks in a number of publicly traded technology companies from another Isle of Man entity known as Jackstones Ltd. (hereinafter "Jackstones").

31.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK knew, in truth and fact, that the Purchase Agreements were false, fraudulent and misleading in that Jackstones possessed no stocks to sell and Barnville had no means to pay for any such stocks.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

32. It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK, in order to conceal the fact that Barnville never acquired any stocks from Jackstones on the dates subscribed to in the various Purchase Agreements, and that the purchases were a sham, caused to be drafted and executed a "Securities Lending Agreement" between Barnville and Jackstones. According to the terms of the Securities Lending Agreement, Barnville, on each day it purchased stocks from Jackstones, immediately loaned the same stocks back to Jackstones in return for "cash" collateral purportedly equal to the purchase price. JEFFREY I. GREENSTEIN and CHARLES H. WILK knew and understood that this lending arrangement would be used to provide an explanation to the clients and their advisors, who, in turn, would provide the explanation to the IRS, as to the reason for the apparent lack of delivery or transfer of any stocks and cash between brokerage accounts of Barnville and Jackstones at the time of the purported purchase and, therefore, conceal the fact that Barnville never owned any stocks in the first place.

33. It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK, in 2000 and 2001, drafted and executed and caused to be drafted and executed false, fraudulent and misleading "Subscription Agreements" to the Global Call Warrants that were purportedly issued by each of the SPVs associated with the POINT clients. According to the "Subscription Agreement," a company known as EA Investment Services Limited subscribed to the Global Call Warrants and in return paid a "Subscription Price" to the SPVs. The purported Subscription Price, in each instance, amounted to millions of U.S. dollars, and, according to the Subscription Agreement, the payments were credited to an account at EA Investment Services Limited for the benefit of each SPV. JEFFREY I. GREENSTEIN and CHARLES H. WILK knew, in truth and fact, that no subscription payments were ever made or going to be made, that EA Investments Limited had neither the intention nor the ability to make any such payments, and that the "Subscription Agreements" were shams, implemented solely to provide a fraudulent business purpose for the transaction.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## C.    False, Fraudulent and Misleading Information Given to Legal Opinion Writers.

34.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK knew and understood that in order to induce clients to participate in POINT, they would need to provide an opinion from respected law firms concluding that the shelter would at least "more likely than not" survive a challenge from the IRS.

35.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK knew and understood that in the event of an audit, these legal opinions would likely be produced to the IRS in defense of the audit and to avoid possible penalties.

36.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK secured the participation of Law Firm C.S. & M. LLP and Law Firm B.C. LLP to opine on the various POINT transactions implemented by the five clients. Law Firm C.S. & M. LLP opined on the first four POINT transactions executed by Quellos in 2000; specifically, Law Firm C.S. & M. LLP opined on the POINT transactions known as Torens, Reka, Burgundy, and Platinum. Law Firm B.C. LLP opined on the last two POINT transactions executed by Quellos in 2001; specifically, Law Firm B.C. LLP opined on POINT transactions known as Titanium and Cobalt. Each opinion concluded that the POINT transaction would "more likely than not" survive a challenge from the IRS.

37.    It was further a part of the conspiracy that in order to conceal and attempt to conceal the true nature of the tax shelter from the opinion writers and, ultimately, the IRS, JEFFREY I. GREENSTEIN and CHARLES H. WILK knowingly and willfully made and caused to be made false, fraudulent and misleading representations to Law Firm C.S. & M. LLP  and Law Firm B.C. LLP about the POINT transaction, knowing that Law Firm C.S. & M. LLP  and Law Firm B.C. LLP would rely upon their representations in order to understand the POINT transactions and to render their "more likely than not" opinions. These false, fraudulent and misleading representations included the following:

a.    JEFFREY I. GREENSTEIN and CHARLES H. WILK falsely,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Greenstein et al Indictment 13

fraudulently and misleadingly represented and caused to be represented that the source of the losses utilized by the clients in the POINT transactions was derived from "stocks" in well-known publicly traded companies that had been purchased by a "non-U.S. investment fund" or "foreign investment fund," and contributed to the various SPVs.

b.      JEFFREY I. GREENSTEIN and CHARLES H. WILK falsely, fraudulently and misleadingly represented and caused to be represented that Barnville was the independent "non-U.S. investment fund" or "foreign investment fund" that formed the SPVs, and that Barnville formed the SPVs independent of any pre-conceived plan to utilize the SPVs for a tax shelter; specifically, that Barnville formed the SPVs in order to profit from the issuance and sale of the "Covered Warrants."

38.      It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK provided and caused to be provided to Law Firm C.S. & M. LLP and Law Firm B. C. LLP the same false, fraudulent, and misleading POINT Strategy document that they had provided to their clients, knowing that the document was false, fraudulent and misleading and knowing and expecting that the firms would rely upon the document to understand the POINT transaction and to render their opinions.

39.      It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK provided and caused to be provided to Law Firm C.S. & M. LLP and Law Firm B.C. LLP the same false, fraudulent, and misleading transactional documents, including the Purchase Agreements and the Securities Lending Agreement between Barnville and Jackstones, and the Subscription Agreements for the Covered Warrants that they had provided to their clients, knowing that the transactional documents were false, fraudulent and misleading, and knowing and expecting that the firms would rely upon such documents to understand the POINT transaction and to render their opinions.

40.      It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK provided and caused to be provided to Law Firms C.S. & M. LLP and B.C. LLP, false, fraudulent and misleading documents regarding the fees paid by the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Clients to implement the POINT tax shelter strategy, in order to hide the actual amount of fees they paid and, thereby, make it falsely appear that the Clients had a reasonable potential of earning a profit from the POINT tax shelter strategy aside from the tax benefits.

41.     It was further a part of the conspiracy that Law Firm C.S. & M. LLP  and Law Firm B.C. LLP provided JEFFREY I. GREENSTEIN and CHARLES H. WILK with drafts of their opinion letters, and relied upon JEFFREY I. GREENSTEIN and CHARLES H. WILK to provide corrections and edits to the factual descriptions of the POINT transactions in the opinion letters.

42.     It was further a part of the conspiracy that as a result of their reliance upon JEFFREY I. GREENSTEIN's and CHARLES H. WILK's representations regarding the POINT transactions, Law Firm C.S. & M. LLP  and Law Firm B.C. LLP issued opinion letters that included false, fraudulent, and misleading descriptions of the POINT transactions.

43.     It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK provided the false, fraudulent, and misleading opinion letters issued by Law Firm C.S. & M. LLP  to clients and prospective clients in order to induce them to participate in the transaction, knowing that the opinion letters were false, fraudulent, and misleading.

**D.     Kickbacks Paid to Matthew G. Krane, the Personal Attorney of Client H.S..**

44.     It was further a part of the conspiracy that in 2001, CHARLES H. WILK met Matthew G. Krane, a tax attorney and advisor to Client H.S.  CHARLES H. WILK learned from Matthew G. Krane that Client H.S. anticipated having more than $1 billion in capital gains in 2001.

45.     It was further a part of the conspiracy that in 2001, JEFFREY I. GREENSTEIN, CHARLES H. WILK and Matthew G. Krane agreed to kickback to Matthew G. Krane a portion of the fees Quellos obtained from Client H.S.

46.     It was further a part of the conspiracy that in 2001, JEFFREY I.

Greenstein et al Indictment 15

GREENSTEIN, CHARLES H. WILK and Matthew G. Krane did not disclose to Client H.S. the kickback arrangement. Instead, beginning in or about March 2001 and continuing through in or about October 2001, JEFFREY I. GREENSTEIN, CHARLES H. WILK and Matthew G. Krane drafted and executed and caused to be drafted and executed a series of false, fraudulent, and misleading fee agreements between Client H.S. and Quellos, wherein Client H.S. was led to believe that he would pay a specific Quellos entity identified in the agreements as "Quellos Financial Advisors LLC" or "QFA," approximately $46 million for work in connection with the POINT transaction, whereas, in truth and fact, JEFFREY I. GREENSTEIN and CHARLES H. WILK, knew that they would divert a majority of those fees to Matthew G. Krane, Client H.S's own attorney.

47. It was further a part of the conspiracy that in or about October 2001, CHARLES H. WILK introduced Matthew G. Krane to J.S. and R.P of Euram, and requested that J.S. and R.P. assist Matthew G. Krane in setting up an offshore entity and an offshore account for Matthew G. Krane.

48. It was further a part of the conspiracy that in or about October 2001, Matthew G. Krane, with the assistance of a Swiss associate, B.H., appropriated an existing offshore shell entity and changed its name to "QFS Consulting Ltd."

49. It was further a part of the conspiracy that in or about October 2001, Matthew G. Krane, with the assistance of a Swiss associate, B.H., opened a bank account at European American Investment Bank A.G. in Vienna, Austria in the name of QFS Consulting Ltd.

50. It was further a part of the conspiracy that in or about October 2001, JEFFREY I. GREENSTEIN and CHARLES H. WILK agreed that the kickback payments for Matthew G. Krane would be paid not to Matthew G. Krane directly, but to QFS Consulting Ltd.

51. It was further a part of the conspiracy that JEFFREY I. GREENSTEIN, CHARLES H. WILK, and Matthew G. Krane knew and intended that the name of the foreign entity and foreign account controlled by Matthew G. Krane, "QFS Consulting

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Ltd.", appeared very similar to a number of Quellos entities that were commonly known by acronyms starting with the letter "Q," including but not limited to "QFA" (Quellos Financial Advisors, LLC), "QCS," (Quellos Customs Strategies, LLC), "QBS," (Quellos Brokerage Services, LLC), "QCM," (Quellos Capital Management, LP), "QFV," (Quellos Financial Ventures, LP), and "QCI" (Quellos Capital International). JEFFREY I. GREENSTEIN, CHARLES H. WILK, and Matthew G. Krane knew and intended that by using the name "QFS," parties who were unaware of the kickback arrangement, including bank representatives overseeing the flow of funds, other advisors of Client H.S., and Client H.S. himself, would be mislead into believing that fees that were in truth diverted to Matthew G. Krane was paid to a Quellos entity consistent with the fee agreements signed by Client H.S.

52.    It was further a part of the conspiracy that on or about October 24, 2001, CHARLES H. WILK instructed a bank to wire approximately $28 million into the "QFS" account in Vienna, Austria, knowing that the money was derived from fees Client H.S. believed he was paying Quellos.

53.    It was further a part of the conspiracy that on or about October 25, 2001, CHARLES H. WILK instructed R.P. to wire approximately $8 million into the "QFS" account in Vienna, Austria, knowing that the money was derived from fees Client H.S. believed he was paying Euram.

54.    It was further a part of the conspiracy that in or about November 2001, after the funds had already been transferred, JEFFREY I. GREENSTEIN, CHARLES H. WILK, and Matthew G. Krane executed and caused to be executed a false, fraudulent, and misleading fee sharing agreement between Quellos and "QFS Consulting Ltd." The agreement specified that Quellos would pay approximately $28 million to QFS Consulting for "certain advisory and consulting services," which "did not constitute the provision of legal advice."

55.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN, CHARLES H. WILK, and Matthew G. Krane did not execute any written agreements to

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

document or otherwise account for the additional $8 million that was wired to QFS on or about October 25, 2001.

56.    It was further a part of the conspiracy that in 2001 and 2002, CHARLES H. WILK knowingly and willfully provided and caused to be provided false, fraudulent and misleading information to Law Firm B.C. LLP about the fees paid by Client H.S. in connection with the Titanium transaction, including providing false, fraudulent and misleading fee calculation documents that excluded large portions of fees paid to Quellos as well as the amounts paid to Matthew G. Krane.

E.    **False and Fraudulent Tax Returns**.

57.    It was further a part of the conspiracy that JEFFREY I. GREENSTEIN and CHARLES H. WILK caused Clients M.Z., R.J., B.J., M.S, and H.S. to file false and fraudulent income tax returns, specifically Form 1040s, claiming capital losses from the sale of the stocks within their respective SPVs which, in truth and fact, JEFFREY I. GREENSTEIN and CHARLES H. WILK knew did not exist.

58.    It was further a part of the conspiracy that the following Quellos clients claimed the following false and fraudulent capital losses on their Form 1040s as a result of their participation in the POINT transactions:

| Taxpayer | Tax Year | Approx. Date of Filing | Approx. amount of Fraudulent Capital Loss |
|---|---|---|---|
| Client M.Z. | 2000 | 1/12/02 | $122 million |
| Client R.J. | 2000 | 12/27/01 | $133 million |
| Client B.J. | 2000 | 12/26/01 | $178 million |
| Client M.S. | 2000 | 4/15/01 | $159 million |
| Client H.S. | 2001 | 10/15/02 | $730 million |
| Client M.S. | 2001 | 10/16/02 | $59 million |

F.    **False, Fraudulent, and Misleading Representations in Anticipation of and During POINT Clients' IRS Audits**.

59.    It was further a part of the conspiracy that sometime between 2003 and 2006, CHARLES H. WILK and JEFFREY I. GREENSTEIN knew that Clients M.Z.,

Greenstein et al Indictment 18

R.J., B.J., M.S., and H.S. were under or anticipated to be under IRS audit as a result of their participation in the POINT tax shelter strategy.

60.    It was further a part of the conspiracy that CHARLES H. WILK, beginning in 2003 and continuing through 2005, when asked by the clients and clients' representatives for assistance responding to IRS inquiries or anticipated IRS inquiries about the POINT transaction, provided and caused to be provided to such clients the same false, fraudulent, and misleading documents that purportedly described and documented the POINT transaction, including the "POINT Strategy" document and underlying transactional documents, such as the stock Purchase Agreements between Barnville and Jackstones, the Securities Lending Agreement between Barnville and Jackstones, and the Warrant Subscription Agreements purportedly executed by the SPVs.

61.    It was a further part of the conspiracy that CHARLES H. WILK, beginning in 2003 and continuing through 2005, when asked by clients and clients' representatives for assistance in responding to the IRS inquiries or anticipated IRS inquiries about the POINT transaction, knowingly and willfully made and caused to be made false, fraudulent, and misleading statements to clients' representatives, including the following:

a.    In or about March 2003, CHARLES H. WILK falsely, fraudulently and misleadingly represented and caused to be represented to attorneys for Clients R.J. and B.J. that the source of the capital losses derived through the POINT transactions were shares of stock in a number of publicly traded companies that Barnville had contributed to the SPVs.

b.    In or about March 2003, CHARLES H. WILK falsely, fraudulently and misleadingly represented and caused to be represented to attorneys for Clients R.J. and B.J. that Barnville formed the SPVs and contributed the securities to those SPVs for an independent business purpose, i.e. to issue "Covered Warrants" for which the SPVs received tens of millions of dollars in premiums.

c.    In or about June 2004, CHARLES H. WILK falsely, fraudulently, and misleadingly represented and caused to be represented to the attorneys for Clients

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

R.J. and B.J. that the only reason Quellos was unable to provide independent documentary evidence of the existence of stocks that were purportedly purchased by Barnville from Jackstones, such as brokerage statements or confirmations, was because Quellos did not have access to the internal records of Barnville and Jackstones, whereas, CHARLES H. WILK knew, in truth and fact, that the real reason Quellos could not provide such records was that no such stocks ever existed.

d. In or about October 2004, in response to demands by attorneys for Clients R.J. and B.J. that Quellos provide a written explanation of the transaction between Barnville and Jackstones to provide to the IRS, CHARLES H. WILK provided a false, fraudulent, and misleading written document in which he stated that Euram introduced Quellos to Barnville who happened to be holding a "stock portfolio", and that Barnville contributed the "Stock" to the SPVs.

e. On or about November 15, 2004, in response to demands by Clients R.J. and B.J. to JEFFREY I. GREENSTEIN for a detailed step-by-step explanation of the transaction between Barnville and Jackstones, CHARLES H. WILK provided the clients with a false, fraudulent, and misleading letter in which he stated, among other things, that " . . . .[Quellos was] not party to the original transactions (Purchase Agreements and Securities Lending Agreements) between Barnville and Jackstones, and therefore, this part of our step-by-step explanation is based on documentation we have reviewed", whereas, CHARLES H. WILK knew, in truth and fact, that he and JEFFREY I. GREENSTEIN were involved in the original transactions between Barnville and Jackstones. CHARLES H. WILK knew that he and JEFFREY I. GREENSTEIN devised the sham sale and loan-back arrangement between Barnville and Jackstones, that JEFFREY I. GREENSTEIN, himself selected the very stocks that were to be used for the sham transactions, and CHARLES H. WILK and JEFFREY I. GREENSTEIN directed C.D., J.S. and R.P. to appropriate the companies and execute the transactions.

f. On November 15, 2004, CHARLES H. WILK further wrote in the letter to Clients R.J. and B.J. that "[t]he Purchase Agreements between Jackstones (as

seller) and Barnville (as purchaser) reflect that Jackstones sold to Barnville the right to beneficial ownership of shares . . . ." whereas CHARLES H. WILK knew, in truth and fact, that the Purchase Agreements falsely stated that actual shares were purchased, and that Barnville engaged in neither a transaction for the "right to beneficial ownership of shares" nor an actual stock purchase since the entire transaction with Jackstones was a sham.

g.   In or about January 2005, CHARLES H. WILK, falsely, fraudulently, and misleadingly represented to attorneys for Client H.S. that Barnville was a "fund" that held a stock portfolio and that this fund was "discovered" by Euram, giving the false, fraudulent and misleading impression that Barnville held actual stock and that its stock portfolio pre-existed Quellos's involvement with the company, whereas CHARLES H. WILK knew, in truth and fact, that Barnville held no stock, and that JEFFREY I. GREENSTEIN and CHARLES H. WILK, together with Euram, appropriated Barnville and directed it to enter into sham stock purchase agreements for the sole purpose of utilizing it in the POINT tax shelter strategy.

62.   It was a further part of the conspiracy that beginning in or about April 2003 and continuing in or about October 2005, representatives of Clients M.Z., R.J., B.J., M.S., and H.S. responded to various IRS Information Document Requests (also known as "IDRs") which sought explanations and documents relating to their respective POINT transactions by forwarding to the IRS the same false, fraudulent and misleading documents that had earlier been provided or caused to be provided by CHARLES H. WILK to such clients, including the "POINT Strategy" document and/or underlying transactional documents, such as the stock Purchase Agreements between Barnville and Jackstones, the Securities Lending Agreement between Barnville and Jackstones, and the Warrant Subscription Agreements purportedly entered into by the various SPVs.

G.   False, Fraudulent and Misleading Testimony During Senate Investigation

63.   It was further a part of the conspiracy that by 2006, the IRS had expanded a "promoter" examination of Quellos to include Quellos' role in the POINT transactions.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

64.    It was further a part of the conspiracy that in or about August 2006, JEFFREY I. GREENSTEIN, in an effort to continue to hide and conceal the true nature of the POINT tax shelter transactions from the IRS and others, knowingly and willfully gave the following false, fraudulent, and misleading testimony before the United States Senate Permanent Subcommittee on Investigations (hereinafter "PSI") that was conducting an investigation into, among other things, the POINT transactions:

a.    JEFFREY I. GREENSTEIN testified that the circular stock purchase and lending agreement entered into between Barnville and Jackstones through which the portfolio of loss stocks were generated was "not dissimilar to swaps or contract for differences or single stock futures," in an effort to mislead the PSI and others into believing that Barnville and Jackstones engaged in legitimate derivative trades, whereas JEFFREY I. GREENSTEIN knew, in truth and fact, that the Barnville/Jackstones purchase and loan-back arrangement was a sham, paper transaction.

b.    JEFFREY I. GREENSTEIN testified that the purported derivative nature of these transactions between Barnville and Jackstones was, to his understanding, disclosed in detail to clients and the clients' advisors, whereas JEFFREY I. GREENSTEIN knew, in truth and fact, that the clients and the clients advisors were never so informed, that none of the descriptions of the POINT transactions provided to the clients and clients advisors described the POINT transaction as such, that none of the transactional documents provided to the clients and the clients' advisors described the transactions between Barnville and Jackstones as such, that none of the opinion letters issued by Law Firm C.S. & M. LLP and Law Firm B.C. LLP described the Barnville and Jackstones transaction as such, and, to the contrary, all representations and materials provided to the clients and client representatives were designed and contrived to mislead them into believing that what Barnville purchased and contributed to the SPVs were actual stock.

c.    JEFFREY I. GREENSTEIN testified that the Covered Warrants issued through each of the SPVs provided a potential for profit for the clients who

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

participated in POINT, whereas JEFFREY I. GREENSTEIN knew, in truth and fact, that the Covered Warrants were sham transactions, and that no real premiums were paid or were ever going to be paid, and that the Covered Warrants never provided any profit potential to the clients who participated in POINT because each transaction was designed to be unwound and completed before the Clients could ever profit from such Covered Warrants.

## IV. OVERT ACTS

65.    In furtherance of the conspiracy and to effect the illegal objects thereof, JEFFREY I. GREENSTEIN and CHARLES H. WILK, and their co-conspirators, known and unknown, committed or caused to be committed the following overt acts, among others, in the Western District of Washington and elsewhere:

a.    Beginning in or about August 4, 1999, and continuing through on or about August 11, 1999, JEFFREY I. GREENSTEIN and CHARLES H. WILK together drafted and edited the "POINT Strategy" document.

b.    On or about August 30, 1999, CHARLES H. WILK sent an email to Partner L.S. at Law Firm C.S. & M. LLP , attaching the "POINT Strategy" document, which, according to CHARLES H. WILK, described the POINT transaction in its "most basic facts."

c.    On or about January 7, 2000, CHARLES H. WILK, with the knowledge and consent of JEFFREY I. GREENSTEIN, forwarded to Partner L.S. at Law Firm C.S. & M. LLP a document that purportedly described how the offshore fund originally obtained its stocks.

d.    On or about January 14, 2000, JEFFREY I. GREENSTEIN sent an email to C.D., attaching a list of stocks that JEFFREY I. GREENSTEIN selected to generate the fake capital losses for the POINT transactions.

e.    On or about January 19, 2000, JEFFREY I. GREENSTEIN sent an email to Partner L.S. of Law Firm C.S. & M. LLP, forwarding a schematic that purportedly explained the POINT transaction in diagram form. The schematic described

Greenstein et al Indictment 23

the transaction as involving the transfer of "stock" from one entity to another entity.

f.    On or about January 20, 2000, JEFFREY I. GREENSTEIN sent an email to an associate at Law Firm C.S. & M. LLP, who was assisting Partner L.S., attaching calculations purportedly demonstrating the potential profits and losses that could be incurred by a POINT investor from the Covered Warrants.

g.    On or about January 24, 2000, JEFFREY I. GREENSTEIN and CHARLES H. WILK received by facsimile from Partner L.S. of Law Firm C.S. & M. LLP, a draft of Law Firm C.S. & M. LLP 's opinion letter regarding the POINT transaction.

h.    On or about February 2, 2000, JEFFREY I. GREENSTEIN, CHARLES H. WILK, C.D., and J.S. of Euram conducted a telephone conference call to discuss the POINT transaction, including, among other things, how Euram had "set up" the companies to be used to generate the sham portfolio; how the parties could increase the size of the sham portfolio to accommodate additional tax shelter clients; how Partner L.S. had not been fully informed as to the manner in which the sham portfolio was created; and the fact that the legal opinion issued by Partner L.S. regarding POINT could be viewed by the IRS as having been "predicated on a fact that [was] not true," specifically, regarding whether the SPVs owned any shares in stock.

i.    On or about February 16, 2000, M.P., an individual in Britain, at the direction of C.D. and J.S., who were, in turn, following the instructions of JEFFREY I. GREENSTEIN and CHARLES H. WILK, met with the Isle of Man corporate administrators of Barnville and Jackstones. During the meeting, M.P. explained the following, which he learned from J.S. and C.D.:

1.    Barnville and Jackstones were both beneficially owned by one individual, L.B., and that individuals at Quellos and Euram, with the permission of L.B., sought to appropriate Barnville and Jackstones for the purpose of executing a tax shelter strategy;

2.    Barnville and Jackstones were being asked, in furtherance of

Greenstein et al Indictment 24

this tax shelter strategy, to enter into a "virtual share transaction" in which Barnville buys a portfolio of non-existent stocks from Jackstones and Jackstones borrows those same shares from Barnville, resulting in no actual exchange of shares or exchange of money;

3.    M.P. acknowledged to the administrators of Barnville and Jackstones that over time, as a result of this transaction, one party would have a large debt owed to the other on the books, but that in the end, because the two entities were beneficially owned by the same person, the companies could eventually be merged and any debts eliminated from the books;

4.    M.P. stated that L.B. would benefit from allowing the entities to be utilized in this manner through the large fees that Euram was expecting to earn as a result of assisting in executing this transaction because L.B. was a shareholder in Euram; and

5.    M.P. agreed that for assisting in the POINT strategy, the corporate administrators for each of the companies would receive a flat fee of £5000 in addition to normal costs and disbursements.

j.    On or about February 29, 2000, JEFFREY I. GREENSTEIN emailed J.S. and C.D. another selection of stocks to be added to the sham portfolio being created between the two offshore companies for use in the POINT transactions.

k.    On or about March 13, 2000, C.D. emailed JEFFREY I. GREENSTEIN that he was greatly disturbed by a meeting he had with an advisor for Client R.J. during which it was made clear to C.D. that this advisor had no idea how the loss stocks were generated, and C.D. demanded a formal letter from Quellos assuring Euram that they had fully informed POINT clients and their advisors of the manner in which the loss stocks were "created."

l.    On or about March 13, 2000, JEFFREY I. GREENSTEIN responded to C.D. in an email stating that the advisor C.D. had met with had no involvement in advising Client R.J. in the POINT transaction, and that he was confident that Partner L.S. had fully advised the Client.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

m.     On or about March 29, 2000, CHARLES H. WILK and JEFFREY I. GREENSTEIN received from J.S. proposed transactional documents for the POINT transaction, including the sham stock Purchase Agreements and the Securities Lending Agreement to be executed between Barnville and Jackstones.

o.     On or about April 4, 2000, J.S. emailed CHARLES H. WILK and asked whether the tax shelter clients and their advisors had been fully informed as to the true nature of the sham stock portfolio between Barnville and Jackstones as promised. CHARLES H. WILK responded that per the advice of Partner L.S., the clients should not be informed about the nature of how the shares were created and how they were contributed into the SPVs.

p.     On or about April 5, 2000, J.S., in response to requests by the corporate administrator for Jackstones for written assurances from Quellos confirming that the POINT clients and their advisors were fully informed of the nature of the share trading transaction between the two offshore companies, stated that they were not able to provide any such written assurances. J.S. further explained that no such written assurances could be provided because Quellos was sensitive about "having anything in writing which suggests that the investment strategy contemplated for the client is completely pre-ordained and exists only for the possibility of achieving a U.S. tax advantage."

q.     In or about April 2000, CHARLES H. WILK edited and caused to be edited transactional documents for the POINT transaction, including the stock Purchase Agreement and the Securities Lending Agreement between Barnville and Jackstones.

r.     On or about the following dates, JEFFREY I. GREENSTEIN and CHARLES H. WILK initiated and then unwound the following POINT transactions in order to generate the fake losses for the POINT clients:

| Approx. Date Initiated | Approx. Date Unwound | Client | Name of Transaction |
|---|---|---|---|
| April 28, 2000 | May 19, 2000 | M.Z. | Torens |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Approx. Date Initiated | Approx. Date Unwound | Client | Name of Transaction |
| --- | --- | --- | --- |
| May 5, 2000 | June 5, 2000 | R.J. | Reka |
| May 10, 2000 | June 5, 2000 | B.J. | Burgundy |
| Nov. 29, 2000 | Dec. 18, 2000 | M.S. | Platinum |
| Sept. 24, 2001 | Nov. 18, 2001 | H.S. | Titanium |
| Nov 7, 2001 | Dec. 10, 2001 | M.S. | Cobalt |

s.       On or about the following dates, JEFFREY I. GREENSTEIN and CHARLES H. WILK caused Law Firm C.S. & M. LLP and Law Firm B.C. LLP to issue false, fraudulent and misleading opinion letters to each of the POINT Clients as follows:

| Approx. Date | Law Firm | Transaction |
| --- | --- | --- |
| Aug. 29, 2000 | Law Firm C. S.& M LLP | Reka |
| Sept. 6, 2000 | Law Firm C. S.& M LLP | Burgundy |
| Sept. 6, 2000 | Law Firm C. S.& M LLP | Torens |
| Dec. 22, 2000 | Law Firm C. S.& M LLP | Platinum |
| Dec. 14, 2001 | Law Firm B.C. LLP | Cobalt |
| Oct. 14, 2002 | Law Firm B.C. LLP | Titanium |

t.       Beginning on or about September 9, 2001, and continuing through September 20, 2001, CHARLES H. WILK informed J.S. through a series of emails and telephone conversations that in order for Euram to be paid for work on Client H.S.'s POINT transaction, they must enter into an advisory services agreement with Client H.S. despite the fact that Euram provided no advisory services to Client H.S.

u.       On or about September 20, 2001, Matthew G. Krane and CHARLES H. WILK drafted an advisory agreement between Euram and Client H.S., backdated to appear to have been effectuated on May 1, 2001, wherein Client H.S. purportedly agreed to pay Euram fees for advising Client H.S. on European aspects of Client H.S.'s business holdings and forwarded the agreement to J.S. for signature.

v.       In or about October 2001, CHARLES H. WILK and Matthew G. Krane telephoned J.S. seeking assistance in setting up a non-U.S. corporation and bank

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

account for Matthew G. Krane.

w.    On or about October 24, 2001, CHARLES H. WILK and Matthew G. Krane caused to be drafted and signed a final fee agreement between Quellos and Client H.S. in which Client H.S. agreed to pay a specific Quellos entity more than $46 million in fees for their work on Client H.S.'s transaction.

x.    On or about October 24, 2001, CHARLES H. WILK by email directed a bank representative to divert approximately $28 million of Client H.S.'s $46 million in fees that had previously been instructed to go to Quellos to, instead, be deposited into an account in the name of "QFS".

y.    On or about October 24, 2001 and October 26, 2001, CHARLES H. WILK, with the knowledge of JEFFREY I. GREENSTEIN, directed J.S. and R.P. in emails to wire transfer approximately $8 million in additional fees collected from Client H.S. to an account in the name of "QFS".

z.    On or about November 5, 2001, JEFFREY I. GREENSTEIN signed on behalf of Quellos a fee splitting agreement, back-dated to October 25, 2001, in which Quellos agreed to pay "QFS Consultants Ltd." approximately $28 million for services it rendered as an "independent advisor" in connection with Client H.S.'s transaction.

aa.    On or about October 26, 2004, CHARLES H. WILK, in response to requests from the audit attorneys for Clients R.J. and B.J. for a written explanation of the POINT transaction, emailed a document in which CHARLES H. WILK explained that Euram introduced Quellos to Barnville, and that Barnville had in its possession a portfolio of stock that was ultimately contributed to the SPVs for use by the clients.

bb.    On or about November 15, 2004, CHARLES H. WILK, in response to further requests by Clients R.J. and B.J. to JEFFREY I. GREENSTEIN for a written description and explanation of the POINT transaction, sent by facsimile a letter stating that Quellos was not a party to the original transaction between Barnville and Jackstones, but from an examination of the documents it appeared that Barnville obtained "rights to an underlying portfolio of stock."

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

cc.    On or about June 7, 2004, during a meeting with representatives of Client H.S. who were handling an audit of Client H.S., CHARLES H. WILK represented and caused to be represented that he had discovered Barnville during a trip to London and was told that it held losses in stocks that it could not use.

dd.    On or about October 21, 2004, CHARLES H. WILK caused to be sent by email the "POINT Strategy" document purporting to describe the POINT transaction to the representatives of Client H.S. who were responding to an audit of the POINT transaction by state taxing authorities and who were also anticipating an audit by the IRS.

ee.    On or about January 24 and 25, 2005, CHARLES H. WILK met with representatives of Client H.S. and represented that Euram found Barnville and Jackstones; that CHARLES H. WILK gave instructions to Euram to find loss stocks and did not think it would be so easy to find the loss stocks. CHARLES H. WILK further stated that while he had no additional information regarding the existence of the stocks, perhaps Client H.S.'s representatives could write a letter to Barnville and Jackstones asking for documentation. CHARLES H. WILK additionally stated that he did not know what advice Euram gave to Client H.S. to earn its fees and that he had simply referred Matthew G. Krane to Euram and they entered into a separate engagement. CHARLES H. WILK also represented that Euram got two fees.

ff.    On or about August 1, 2006, JEFFREY I. GREENSTEIN testified under oath before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs United States Senate regarding POINT. JEFFREY I. GREENSTEIN testified that it appeared to him that Jackstones and Barnville engaged in a transaction "not dissimilar to swaps or contract for differences or single stock futures", that the Covered Warrants provided clients with a potential for profit, and that it was his understanding that the clients and their advisors were made fully aware of the nature of the POINT transaction.

66.    In furtherance of the conspiracy, and to accomplish one or more of its

Greenstein et al Indictment 29

objects, one or more of the conspirators committed or caused to be committed the overt acts described in Counts 2-14 of this Superseding Indictment.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 2-9
### (Tax Evasion)

67.    The allegations set forth in paragraphs 1-65 of this Superseding Indictment are incorporated and re-alleged as if fully set forth herein.

68.    From in or about June 1999 through at least about October 2005, in the Western District of Washington and elsewhere, JEFFREY I. GREENSTEIN and CHARLES H. WILK, unlawfully, willfully and knowingly did attempt to evade and defeat and aid and abet in the attempt to evade and defeat a substantial part of the income tax due and owing by the POINT tax shelter clients set forth below to the United States of America for the calendar years set forth below, by committing and causing to be committed the following affirmative acts, among others:

a.    preparing and executing and causing to be prepared and executed false and fraudulent documents to deceive the IRS, including promotional documents purporting to describe the POINT transaction, transactional documents, and opinion letters;

b.    creating and causing to be created entities to be used in executing the POINT tax shelter transaction;

c.    preparing and filing, and causing to be prepared and filed, false and fraudulent tax returns; and

d.    taking various steps to attempt to defeat the audit of the POINT tax shelter clients by causing clients' representatives to provide false, fraudulent and misleading information and documents to the IRS, purporting to describe and document their respective POINT transactions, including, but not limited to, the "POINT Strategy" document and/or underlying transactional documents, such as the stock Purchase Agreements between Barnville and Jackstones, Securities Lending Agreements between Barnville and Jackstones, and the Warrant Subscription Agreements purportedly entered

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

into by the various SPVs.

| Count | Client | Tax Returns | Approx. Amount of Fraudulent Tax Savings | Approx. Date of Filing |
|-------|--------|-------------|------------------------------------------|------------------------|
| 2 | Client M.Z. | 2000 Form 1040 | $24 million | 1/12/02 |
| 3 | Client R.J. | 2000 Form 1040 | $18 million | 12/27/01 |
| 4 | Client R.J. | 2003 Form 1040 | $3 million | 10/18/04 |
| 5 | Client R.J. | 2004 Form 1040 | $2 million | 10/18/05 |
| 6 | Client B.J. | 2000 Form 1040 | $36 million | 12/26/01 |
| 7 | Client M.S. | 2000 Form 1040 | $32 million | 4/15/01 |
| 8 | Client H.S. | 2001 Form 1040 | $276 million | 10/15/02 |
| 9 | Client M.S. | 2001 Form 1040 | $11 million | 10/16/02 |

All in violation of Title 26, United States Code, Section 7201 and Title 18, United States Code, Section 2.

### COUNTS 10-14
### (Counseling False Tax Filings)

69.     The allegations set forth in paragraphs 1-65 of this Superseding Indictment are incorporated and re-alleged as if fully set forth herein.

70.     On or about the dates hereinafter set forth, in the Western District of Washington, and elsewhere, JEFFREY I. GREENSTEIN and CHARLES H. WILK, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of U.S. Returns of Partnership Income, Forms 1065, for the partnership entities and calendar years hereinafter specified.  The returns were false and fraudulent as to material matters, in that they represented and caused to be represented that the partnership entities were entitled under the provisions of the Internal Revenue laws to report the following capital losses in amounts hereinafter specified, whereas, as JEFFREY I. GREENSTEIN and CHARLES H. WILK  then and there knew, the partnership entities were not entitled to report the capital losses in such amounts.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Greenstein et al Indictment 31

| Count | Partnership | Tax Year | Approx. Date of Filing | Approx. amount of Fraudulent Capital Loss |
|-------|-------------|----------|------------------------|-------------------------------------------|
| 10 | Torens Limited | 2000 | 10/24/01 | $137 million |
| 11 | Reka Limited | 2000 | 10/15/01 | $137 million |
| 12 | Burgundy Limited | 2000 | 10/15/01 | $158 million |
| 13 | Titanium Trading Partners LLP | 2001 | 10/15/02 | $614 million |
| 14 | Cobalt Trading Partners LLP | 2001 | 6/17/02 | $54 million |

All in violation of Title 26, United States Code, Section 7206(2).

### COUNTS 15-17
### (Wire Fraud)

71.    Beginning at a time unknown, but no later than in or about June 1999 and continuing until in or about January 2005, in Seattle, Washington, within the Western District of Washington, and elsewhere, JEFFREY I. GREENSTEIN and CHARLES H. WILK, together with others known and unknown, did knowingly devise and intended to devise, and aided and abetted in devising, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and concealment of material facts, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate commerce for the purpose of executing the scheme.

### I. INTRODUCTION.

72.    The allegations set forth in paragraphs 2-18 of this Superseding Indictment are incorporated and re-alleged as if fully set forth herein.

### II. ESSENCE OF THE SCHEME AND ARTIFICE TO DEFRAUD.

73.    The essence of the scheme and artifice to defraud was for JEFFREY I. GREENSTEIN and CHARLES H. WILK to design, market and execute a fraudulent tax

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

shelter known as POINT on behalf of wealthy individuals through which they could and did earn millions of dollars in fees, as well as retain the wealthy clients as investors in Quellos' various investment funds through which the company earned additional revenue. The scheme and artifice to defraud proceeded in two phases:

a. First, in order to induce clients to participate in the fraudulent tax shelter, JEFFERY I. GREENSTEIN and CHARLES H. WILK provided and caused to be provided false, fraudulent and misleading marketing documents, transactional documents, and false, fraudulent and misleading legal opinion letters from national law firms all of which described the transaction as involving the purchase of partnerships that owned low value/high basis "stocks," whereas, JEFFREY I. GREENSTEIN and CHARLES H. WILK knew, in truth and fact, that the transactions did not involve any such stocks.

b. Second, JEFFREY I. GREENSTEIN and CHARLES H. WILK were aware that clients who executed the POINT tax shelter strategy would likely be subject to IRS audit. As such, JEFFREY I. GREENSTEIN and CHARLES H. WILK, in furtherance of the continuing scheme and artifice to defraud, provided and caused to be provided false, fraudulent and misleading representations and explanations about the POINT transactions to the clients in response to their requests for assistance with audits and anticipated audits in order to prevent detection of the scheme and artifice, and to prevent the loss of such clients as investors.

74. As a result of their scheme and artifice to defraud, a total of five individuals – Clients M.Z., R.J., B.J., M.S., and H.S. – paid approximately $86 million in fees to participate in POINT. Moreover, these clients also collectively invested tens of millions of dollars in various Quellos investment vehicles, earning Quellos substantial sums in additional fees.

### III.  MANNER AND MEANS OF THE SCHEME AND ARTIFICE TO DEFRAUD.

75. The manner and means of the scheme and artifice to defraud are set forth in paragraphs 20-65 of this Superseding Indictment, which are incorporated and re-alleged

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

as if fully set forth herein.

## IV. EXECUTION OF THE SCHEME AND ARTIFICE TO DEFRAUD.

76.     On or about the dates set forth below, at Seattle, Washington, within the Western District of Washington, and elsewhere, having devised the above-described scheme and artifice to defraud, JEFFREY I. GREENSTEIN and CHARLES H. WILK, for the purpose of executing this scheme and artifice to defraud, did knowingly cause to be transmitted by wire communication in interstate or foreign commerce writings, signals, picture, and sounds, each transmission of which constitutes a separate count of this Superseding Indictment.

| Count | Date | Sender | Recipient | Wire Transmission |
|---|---|---|---|---|
| 15 | 10/21/04 | Employee of Quellos | Attorney for Client H.S. | Email sent from Seattle, Washington to Los Angeles, California attaching the "POINT Strategy" document, which falsely, fraudulently and misleadingly described the POINT transaction as involving the acquisition by the taxpayer of high/basis low value "stock" that had been contributed to a partnership by an "offshore investment fund." |
| 16 | 10/26/04 | CHARLES H. WILK | Attorney for Clients R.J. and B.J. | Email sent from Seattle, Washington to New York, New York attaching a document entitled "Barnville," which falsely stated that Barnville contributed "stock" to the SPV acquired by the clients. |
| 17 | 11/15/04 | CHARLES H. WILK | Clients R.J. and B.J. | Faxed letter sent from Washington D.C. to New York, New York in which CHARLES H. WILK falsely suggests that Quellos was not involved in the original transaction between Barnville and Jackstones; that the documents appear to indicate that Jackstones sold to Barnville "the right to beneficial ownership of shares . . . ." |

All in violation of Title 18, United States Code, Sections 1343 and 2.

Greenstein et al Indictment 34

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**COUNT 18**
**(Conspiracy to Launder Monetary Instruments)**

77.    Beginning at a time unknown, but no later than in or about March 2001, and continuing through in or about January 2008, at Seattle, Washington, within the Western District of Washington, and elsewhere, MATTHEW G. KRANE, JEFFREY I. GREENSTEIN, and CHARLES H. WILK, together with others known and unknown to the Grand Jury, did knowingly combine, conspire, and agree with each other to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit, to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is Deprivation of Honest Services Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

**I. INTRODUCTION.**

At various times relevant to this Superseding Indictment:

78.    The allegations set forth in paragraphs 2-18 of this Superseding Indictment are incorporated and re-alleged as if fully set forth herein.

79.    Defendant MATTHEW G. KRANE was an attorney, licensed in the State of California.  MATTHEW G. KRANE was a sole practitioner who specialized in the area of tax.

80.    Client H.S. was a Los Angeles based business man.  Beginning approximately in 1990 or 1991, MATTHEW G. KRANE was engaged by Client H.S. to provide tax advice and tax planning services to Client H.S. and Client H.S.'s business.

81.    B.H. is a resident of Switzerland and a business associate of MATTHEW G. KRANE.

## II. THE ESSENCE OF THE SPECIFIED UNLAWFUL ACTIVITY: DEPRIVATION OF HONEST SERVICES WIRE FRAUD.

82.     Attorneys practicing law in California owe both a fiduciary duty to their clients and a duty of loyalty to act in their clients' best interests, both financially and otherwise, and to comply with the California Rules of Professional Conduct.

83.     Rule 3-310 of the California Rules of Professional Conduct requires that members of the California Bar "shall not accept or continue representation of a client without providing written disclosure to the client where...the member has or had a legal, business, financial, or professional interest in the subject matter of the representation."

84.     The essence of the Specified Unlawful Activity is that beginning in or about January 2001 and continuing through in or about December 2002, MATTHEW G. KRANE, knowingly and willfully devised and intended to devise a scheme and artifice to defraud, to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions, and to deprive Client H.S. of his intangible right to honest services as his attorney.

85.     It was part of the scheme and artifice to defraud that in late 2000, Client H.S. engaged MATTHEW G. KRANE to find a means to minimize anticipated capital gains taxes stemming from a sale of certain of Client H.S.'s assets.

86.     It was a further part of the scheme and artifice to defraud that sometime in early 2001, MATTHEW G. KRANE introduced Client H.S. to Quellos and CHARLES H. WILK who, according to MATTHEW G. KRANE, had devised a financial transaction through which Client H.S. could shelter his capital gains.

87.     It was a further part of the scheme and artifice to defraud that MATTHEW G. KRANE represented to Client H.S. that he would need to pay approximately $46 million in fees to Quellos for their work in implementing the transaction. MATTHEW G. KRANE represented that the fees were reasonable because the transaction would save Client H.S. substantially more in taxes than it cost.

88.     It was a further part of the scheme and artifice to defraud that Client H.S., relying upon the advice and representations of MATTHEW G. KRANE that the

Greenstein et al Indictment 36

transaction was legitimate and that the fees and costs were reasonable, agreed to enter into the tax shelter transaction with Quellos.

89. It was a further part of the scheme and artifice to defraud that, contrary to what MATTHEW G. KRANE represented to Client H.S. about the fee arrangements, MATTHEW G. KRANE, JEFFREY I. GREENSTEIN, and CHARLES H. WILK had entered into a separate agreement whereby JEFFREY I. GREENSTEIN and CHARLES H. WILK promised to kickback to MATTHEW G. KRANE more than half of the fees that Client H.S. agreed to pay Quellos.

90. It was a further part of the scheme and artifice to defraud that MATTHEW G. KRANE, contrary to his duties as Client H.S.'s attorney, never disclosed to Client H.S. the kickback arrangement he had entered into with JEFFREY I. GREENSTEIN and CHARLES H. WILK.

91. It was a further part of the scheme and artifice to defraud that MATTHEW G. KRANE knew about and participated with CHARLES H. WILK and others in creating false and misleading documents to hide from the Internal Revenue Service and others the true amount of fees and costs paid by Client H.S. to take part in the tax shelter transaction.

92. It was a further part of the scheme and artifice to defraud that in or about October and November 2001, when Client H.S.'s tax shelter transaction was completed, CHARLES H. WILK, in Seattle, Washington, in fulfillment of the kickback arrangement with MATTHEW G. KRANE, caused, by means of international wire transfers, the following payments totaling approximately $36 million:

    a.    On or about October 31, 2001, the transfer of approximately $28 million from HSBC Bank in New York, New York, to European American Investment Bank AG in Vienna, Austria, for the benefit of an account in the name of QFS Consultants, Ltd;

    b.    On or about October 25, 2001, the transfer of approximately $7.5 million from HSBC Bank in New York, New York, to European

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

American Investment Bank AG in Vienna, Austria, which amount was further transferred on or about November 1, 2001, to another account in European American Investment Bank AG in Vienna, Austria for the benefit of an account in the name of QFS Consultants, Ltd.

c. On or about November 7, 2001, the transfer of approximately $600,000 from HSBC Bank in New York, New York, to European American Investment Bank AG in Vienna, Austria, for the benefit of an account in the name of QFS Consultants, Ltd.

C. **Manner and Means of the Conspiracy to Launder Monetary Instruments**.

93. The manner and means by which MATTHEW G. KRANE, JEFFREY I. GREENSTEIN, CHARLES H. WILK, and their coconspirators sought to accomplish the object of the conspiracy included, among other things, the following:

94. In or about October 2001, CHARLES H. WILK, who was working in Seattle, Washington, introduced MATTHEW G. KRANE to J.S. and R.P. in London, England, and requested that J.S. and R.P. assist MATTHEW G. KRANE in establishing an offshore company and an offshore bank account to hold MATTHEW G. KRANE's share of fees generated from Client H.S.'s tax shelter transaction.

95. In or about October 2001, MATTHEW G. KRANE and B.H. agreed that in return for a payment of $1 million, B.H. would act on behalf of MATTHEW G. KRANE as the sole beneficial owner of the offshore company to be set up through the assistance of J.S. and R.P. B.H. further agreed with MATTHEW G. KRANE that he would manage an offshore account in the name of this offshore company on MATTHEW G. KRANE's behalf.

96. In or about October 2001, B.H., through the assistance of R.P. and others, utilized a corporate administrator based in Gibraltar to obtain the use of a shell company known as Eldred Ltd., incorporated in the British Virgin Islands.

97. On or about October 24, 2001, at the behest of MATTHEW G. KRANE,

Greenstein et al Indictment 38

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

B.H. instructed the corporate administrator of Eldred Ltd. to change the name of the company to QFS Consultants Ltd. QFS was similar to acronyms used by various subsidiaries of Quellos. MATTHEW G. KRANE chose the name QFS so that documents regarding fees that were, in truth, being paid to MATTHEW G. KRANE in fulfillment of the kickback arrangement with JEFFREY I. GREENSTEIN and CHARLES H. WILK, would fraudulently appear to others as if they were being paid to Quellos.

98.     On or about October 24, 2001, at the behest of MATTHEW G. KRANE, B.H. opened a bank account in Vienna, Austria, at European American Investment Bank AG in the name of QFS.

99.     On or about October 31, 2001, at the behest of MATTHEW G. KRANE, CHARLES H. WILK, from Seattle, Washington, emailed instructions to HSBC, a bank in New York, to transfer approximately $28 million from the fees generated from Client H.S.'s tax shelter transaction to the QFS account at European American Investment Bank AG in Vienna, Austria.

100.    On or about October 25, 2001, approximately $28 million in proceeds from the above described scheme and artifice to defraud as set forth in paragraphs 82 through 92, was transferred via wire from an HSBC account in New York, New York, to an account in the name of QFS at European American Investment Bank AG in Vienna, Austria.

101.    On or about October 25, 2001, at the behest of MATTHEW G. KRANE and consistent with the undisclosed fee sharing agreement as described in above paragraphs 82 through 92, CHARLES H. WILK, with the knowledge and consent of JEFFREY I. GREENSTEIN, emailed from Seattle, Washington, instructions to Euram, to transfer approximately $8 million in additional fees generated from Client H.S.'s tax shelter transaction that had been held in the name of Euram to the QFS account at European American Investment Bank AG in Vienna, Austria.

102.    On or about November 1, 2001, in accordance with the instructions from CHARLES H. WILK, Euram caused approximately $7.5 million in proceeds from the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

above described scheme and artifice to defraud as set forth in paragraphs 82 through 92, to be transferred from an account in the name of Euram at European American Investment Bank AG in Vienna, Austria, to the account in the name of QFS at European American Bank AG in Vienna, Austria.

103. On or about November 7, 2001, in accordance with the instructions from CHARLES H, WILK, Euram caused approximately $600,000 in proceeds from the above described scheme and artifice to defraud as set forth in paragraphs 82 through 92, to be transferred from an account at HSBC in New York, New York, to the account in the name of QFS at European American Investment Bank AG in Vienna, Austria.

104. In or about October 2001, in response to due diligence demands by the QFS corporate administrators for explanations as to the source of the $36 million in funds held by QFS, MATTHEW G. KRANE, CHARLES H. WILK and JEFFREY I. GREENSTEIN agreed to execute a written agreement wherein it was made to falsely appear that QFS, and not MATTHEW G. KRANE, obtained the money as a result of a fee-sharing agreement with Quellos for "non-legal" advisory services that QFS provided in connection with Client H.S.'s tax shelter transaction.

105. In or about October 2001, MATTHEW G. KRANE instructed B.H. to find someone wholly unrelated to Client H.S. and MATTHEW KRANE to sign the written fee-sharing agreement on behalf of QFS. B.H. agreed to do so, and caused an acquaintance in London, with no connections to Client H.S., MATTHEW KRANE, or QFS, to sign the agreement on behalf of QFS.

106. On or about November 5, 2001, B.H. faxed from Switzerland the written fee-sharing agreement between QFS and Quellos to Seattle, Washington, for execution of the agreement by Quellos.

107. On or about November 5, 2001, JEFFREY I. GREENSTEIN, in Seattle, Washington, executed the fee sharing agreement on behalf of Quellos, and CHARLES H. WILK caused the agreement to be faxed back to B.H. in Switzerland. B.H. then submitted the executed agreement to the QFS corporate administrators in fulfillment of

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

their due diligence request.

108. By January 2002, the QFS corporate administrators continued to be dissatisfied with the explanation for the source of the $36 million held by QFS. In or about January 2002, in response to the corporate administrator's continued due diligence requests, MATTHEW G. KRANE and B.H. submitted and caused to be submitted a false document that falsely explained that the source of the QFS funds were fees from complex work done by B.H. in connection with the sale of Client H.S.'s assets. In truth, B.H. had done no work in connection with the sale of Client H.S.'s assets.

109. In or about January 2002, MATTHEW G. KRANE caused to be incorporated in the State of Delaware a new corporation known as Goldfluegel Partnerschaft, LLC (hereinafter "Goldfluegel").

110. In or about July 2002, MATTHEW G. KRANE caused to be opened a new bank account at European American Investment Bank AG in Vienna, Austria in the name of Goldfluegel.

111. On or about July 31, 2002, MATTHEW G. KRANE and B.H. instructed European American Investment Bank AG to transfer approximately $35 million in proceeds from the above described scheme and artifice to defraud held in the European American Investment Bank AG's QFS account to the new account in the name of Goldfluegel. MATTHEW G. KRANE and B.H. agreed that the remaining approximately $1 million in proceeds in the QFS account was for B.H.'s use in fulfillment of MATTHEW G. KRANE's agreement to pay B.H. for his involvement with QFS.

112. On or about the dates listed below, MATTHEW KRANE caused the following wire transfers from the European American Investment Bank AG's account in Vienna, Austria, in the name of Goldfleugel, to an account in the name of MATTHEW G. KRANE at Charles Schwab & Company, Inc. in San Francisco, California. These monetary transactions involved proceeds from the above described scheme and artifice. In an effort to disguise the purpose, source, and nature of these monetary transactions, MATTHEW G. KRANE caused each of the wired funds to be accompanied with a false

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

notation that these amounts were being paid to MATTHEW G. KRANE for "legal fees."

| Date of Wire Transfer | Amount of Wire Transfer |
|---|---|
| November 18, 2004 | $ 86,259.77 |
| February 23, 2005 | $76,277.23 |
| December 30, 2005 | $124,939.52 |
| April 12, 2006 | $137,288.68 |
| September 5, 2006 | $198,814.07 |
| February 8, 2007 | $164,426.22 |
| June 11, 2007 | $192,049.93 |
| September 21, 2007 | $65,587.06 |

All in violation of Title 18, United States Code, Section 1956(h).

## ALLEGATION OF FORFEITURE

113.    The allegations contained in Count 18 of this Superseding Indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 982(a)(1)(A).

114.    As a result of the money laundering offense, in violation of Title 18, United States Code, Section 1956(h) as alleged in Count 1 above, the defendant MATTHEW G. KRANE, shall forfeit to the United States the sum of $36 million as property involved in or traceable to the above-described money laundering violations.

115.    If any of the forfeitable property, as a result of any act or omission of the Defendants

     a.    cannot be located upon the exercise of due diligence;

     b.    has been transferred or sold to, or deposited with, a third party;

     c.    has been placed beyond the jurisdiction of the Court;

     d.    has been substantially diminished in value; or

     e.    has been commingled with other property which cannot be subdivided without difficulty;

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c), including but not limited to the following:

> The residence located at:
> 1451 Kings Road
> Los Angeles, California 90069.

All pursuant to Title 18, United States Code, Sections 982 (a)(1).

A TRUE BILL:

DATED:   6/04/2009

Signature of Foreperson redacted pursuant to the policy of the Judicial Conference of the United States.

_____
FOREPERSON

_____
JEFFREY C. SULLIVAN
United States Attorney

_____
MARK BARTLETT
First Assistant United States Attorney

_____
KATHERYN KIM PRIERSON
Assistant United States Attorney

Greenstein et al Indictment 43